```
 1                      UNITED STATES DISTRICT COURT

 2                      EASTERN DISTRICT OF NEW YORK

 3    MARVEL CHARACTERS, INC.,      .  Docket No.
                                    .  21-cv-05316-DG-TAM
 4         Plaintiff,               .
                                    .
 5            v.                    .  Brooklyn, New York
                                    .  Wednesday, January 26, 2022
 6    SOLO, ET AL.,                 .  2:05 p.m.
                                    .
 7         Defendants.              .
      . . . . . . . . . . . . . . . .
 8

 9

              TRANSCRIPT OF TELEPHONIC INITIAL CONFERENCE
10                BEFORE THE HONORABLE TARYN A. MERKL
                    UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:          O'Melveny & Myers LLP
13                               DANIEL M. PETROCELLI, ESQ.
                                 1999 Avenue of the Stars
14                               7th Floor
                                 Los Angeles, California  90067
15                               310-553-6700

16                               O'Melveny & Myers LLP
                                 ALLEN W. BURTON, ESQ.
17                               7 Times Square
                                 New York, New York  10033
18                               212-326-2061

19                               O'Melveny & Myers LLP
                                 DANIELLE FEUER, ESQ.
20                               400 South Hope Street
                                 Los Angeles, California  90071
21                               213-430-6069

22

23

24

25
                       Opti-Script, Inc. | 800-494-7500
                       P.O. Box 77, Winfield, PA 17889
                          production@opti-script.com
```

```
 1   APPEARANCES CONTINUED:

 2

 3   For the Defendants:        Toberoff & Associates, PC
                                MARC TOBEROFF, ESQ.
 4                              23823 Malibu Road
                                Suite 50-363
 5                              Malibu, California  90256
                                310-246-3333
 6

 7   Transcription Service:     Opti-Script, Inc.
                                P.O. Box 77
 8                              Winfield, PA 17889
                                800-494-7500
 9

10
     Proceedings recorded by electronic sound recording;
11   transcript produced by transcription service.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       P R O C E E D I N G S
 2            THE COURT:  Good afternoon.
 3            Ms. Cahn, could you call the case, please?
 4            THE CLERK:  This is civil cause for initial
 5   conference, Docket 21-cv-5316, Marvel Characters, Inc. v.
 6   Solo, et al.
 7            Before asking the parties to state their appearance
 8   I would like to note the following:  Persons granted remote
 9   access to proceedings are reminded of the general prohibition
10   against photographing, recording, and rebroadcasting of court
11   proceedings.  Violation of these prohibitions may result in
12   sanctions including removal of court-issued media
13   credentials, restricted entries to future hearings, denial of
14   entries to future hearings, or any other sanctions deemed
15   necessary by the Court.
16            Will the parties please state their appearances for
17   the record, starting with the Plaintiff.
18            MR. PETROCELLI:  Yes.  Good afternoon, Your Honor.
19   Daniel Petrocelli, Danielle Feuer, and Allen Burton for
20   Plaintiff and Counterclaim Defendant, Marvel Characters.
21            MR. TOBEROFF:  Good afternoon, Your Honor.  Marc
22   Toberoff appearing for the Defendants, Nanci Solo and Erik
23   Colan -- I should say the Defendants and Counter Claimants.
24            THE COURT:  Good afternoon to all of you.  So we're
25   here today for an initial conference.  And based on your case
```

1  management plan it sounds as though there are some similar
2  cases out there, as well.  And I'm curious sort of about the
3  big picture here, Mr. Petrocelli, so I'd like to turn the
4  floor over to you to learn more about, you know, what's going
5  on with regard to this and the interrelated cases and where
6  you think all of this is headed.
7            MR. PETROCELLI:  Thank you, Your Honor.  About 10
8  years ago there was a case in front of Judge McMahon in the
9  Southern District that was litigated and resulted in a
10 decision in favor of Marvel regarding very similar issues and
11 very similar characters.  It was affirmed on by the Second
12 Circuit.  A cert petition was filed and the matter was
13 ultimately resolved.
14           Mr. Toberoff was the opposing counsel in that case.
15 I was not involved.  It was another firm.
16           So now we go 10 years later and similar issues have
17 now arisen where the heirs of various creators have sought to
18 terminate works under the copyright law, and Marvel believes
19 that the works are not subject to termination because the
20 copyright law indicates that works for hire are not eligible
21 for termination.
22           So we have instituted a series of declaratory
23 relief actions, four of which are in the New York Federal
24 Courts.  Your Honor has one of them.  And three of them are
25 in front of Judge Kaplan.  And Judge Kaplan has issued a

1  scheduling order.  And what we have endeavored to do in this
2  case, Your Honor, is to set forth a scheduling order that
3  tracks the same one that Judge Kaplan has issued.
4           This is a case that in all likelihood will be
5  disposed of by summary judgement.  I anticipate both sides
6  will make cross motions for summary judgment after discovery.
7  But if it's not disposed of by summary judgment, then, you
8  know, it would aim towards a trial sometime in -- no earlier
9  than, I would say, May of 2023.
10          Mr. Toberoff and we are engaged in discussions.
11 We've not yet reached resolution about whether this case can
12 be consolidated with the cases in front of Judge Kaplan.  We
13 anticipate either reaching an agreement on that issue in the
14 near future or, absent an agreement, there may be a motion to
15 transfer venue to Judge Kaplan, just in the interest of
16 having a coordinated efficient case management plan given the
17 overlap of these cases.
18          For example, this case involves some of the same
19 characters that are involved in the cases in front of Judge
20 Kaplan.
21          THE COURT:  Okay.  I mean, it all makes a lot of
22 sense.  So the Defendants are -- the heirs are different in
23 the case but they were involved -- the creators were involved
24 in some of the same --
25          MR. PETROCELLI:  Yes.

1   THE COURT: -- issues and same character
2   development?
3   MR. PETROCELLI: Exactly. Yeah. There are
4   different individuals who were involved but some of the
5   characters overlap -- some of the well-known Marvel
6   characters that various folks were involved in creating these
7   comic books way back when.
8   THE COURT: Got it. Okay.
9   MR. TOBEROFF: Your Honor?
10  THE COURT: Yes.
11  MR. TOBEROFF: Your Honor, if I may --
12  THE COURT: Yes. Is this Mr. Toberoff? I was
13  going to turn to you next, so I just need to be very clear
14  for the record who's speaking.
15  MR. TOBEROFF: I appreciate that. I'm sorry.
16  THE COURT: That's okay.
17  MR. TOBEROFF: This is Marc Toberoff on behalf of
18  the Defendants and Counter Claimants.
19  I disagree, just first of all, with a number of
20  these statements. First of all, to put this in context, the
21  Copyright Act allows creators to terminate without cause
22  prior transfers of copyright in their work precisely because
23  at the time of the original creation creators do not know the
24  market value of their works and therefore they have no
25  leverage, unlike real estate, for instance, where you know

```
 1   the value and that value will dictate the purchase price -- a
 2   little more or a little less.
 3            Creators have no such advantage.  And because of
 4   that, you know, publishers are always going to want to
 5   acquire creations for as little money -- as many rights as
 6   possible for as little money as possible.
 7            So Congress created this extraordinary right which
 8   cuts through ordinary contract principles, which allows
 9   creators to recover their copyright interests many
10   years -- 56 years after creation so that they or their
11   families can finally reap some of the financial benefits,
12   knowing -- because this applies only to the U.S. -- that that
13   will result in a new license with the publisher, or in this
14   case Marvel/Disney.
15            So that's the backdrop of this.  You don't
16   terminate copyrights.  You terminate transfers of copyright
17   and we will show in this case that this was not work for
18   hire, that in fact this was a transfer.  Even on the back of
19   Marvel's checks they had specific assignment language, which
20   is the opposite of work for hire, which is owned at its
21   inception.  You don't assign the work.  And they were
22   essentially purchased by the page these artists' creations.
23            And to lump everything together and just say, oh,
24   it's similar issues and characters -- they're not similar.
25   You know, that's like saying Captain America is like Groot.
```

```
 1   These are a wide variety of very original creations.  That's
 2   why Marvel's been so successful, due to the originality of
 3   these creations, and the circumstances of their creation vary
 4   from artist to artist and from character to character.
 5            With respect to the cases in the -- with Gene
 6   Colan -- and so this is a very different set of circumstances
 7   to the Kirby case because you're dealing with different
 8   literary creations and you're dealing with different artists
 9   even though there could be some similarity that certain -- in
10   certain places.
11            The characters that were created -- or co-created
12   by Gene Colan are fairly distinct.  There's maybe some
13   overlap because this applies to a number -- he was very
14   prolific.  So there may be some overlap or co-creation or he
15   may have worked at times on other characters.
16            But the work that these people did was different.
17   The work the artists did was very different from the work of
18   a writer or the work, for instance, of Stan Lee, who would
19   essentially, you know, fill in the balloons -- the dialog
20   balloons.  It's very interesting when you get into it.
21            On a superficial level, one might see efficiencies
22   in consolidation, but I think it also leads to a lot of
23   confusion.  I think it's Marvel's interest to sort of lump
24   all these people together and just call them artists and say
25   it's all work for hire.  But the reality is they're very
```

1  different factual scenarios.
2          And so I think it could actually lead to a lot of
3  confusion to consolidate these cases.  And although it's
4  noteworthy that although there are three cases -- I believe
5  it's three -- before Judge Kaplan, they were sent to
6  Judge -- three of them -- or two of them were sent to Judge
7  Kaplan because they're related, but he had not consolidated
8  those cases within his court, I don't believe.
9          So that's where we are, and we believe this should
10 proceed, you know, like a regular case.
11         THE COURT:  Okay.  Well, I certainly anticipate at
12 this juncture that it's going to proceed like a regular case
13 absent, you know, motion practice that suggests there should
14 be a different outcome based on appropriate legal authority.
15         So we're here for the initial conference.  It's
16 fascinating to hear the arguments.  I also have to say that
17 the complaint was super interesting to me.  As a non-artist,
18 I can't even imagine producing comic books at the rate these
19 people were able to do so back in the day before computers.
20 It's incredible.  So I found the whole case very interesting.
21         But since we're here for the initial conference we
22 certainly should turn to the schedule unless there's anything
23 else by way of background that the parties would like to
24 raise.
25         The parties, you know, have given this proposed

1   case management worksheet.  It's a different form than the
2   one I use.  That's fine.  I understand, given the
3   circumstances of the other cases, that it's certainly
4   beneficial to keep things on a reasonably similar schedule.
5           So I have no problem with the parties' proposed
6   schedule, just noting for the record that the parties'
7   pre-trial schedule suggests that the deadline to amend the
8   pleadings and join new parties would be April 8th, and fact
9   discovery is scheduled for completion by November 18th of
10  this year.  And then experts will commence with initial
11  expert disclosures by November 28th and rebuttal witness
12  expert disclosures by December 16th.  And expert discovery
13  should be complete by January 16th of 2023.
14          And that would render the last date to file
15  your -- the first step of dispositive motion practice here
16  with Judge Gujarati would be filing a pre-motion conference
17  letter, and that would be by February 20th of next year.
18          So you know, this all seems completely fine to me.
19  I'm not going to set a final pre-trial conference at this
20  time.  It's not our practice to do so until the motions are,
21  you know, under advisement, they're ruled on, et cetera.  If
22  the case goes to motions we won't even be directing you to
23  file your joint pre-trial order at that juncture until we
24  have some clarity on the timeline for the potential trial.
25  So I won't be setting a pre-trial conference.

11

1  What I do like to set though, you know, if there's
2  a schedule that goes this far out is sort of an interim
3  status report or status conference so that we can just check
4  in with you, see if everything is going swimmingly,
5  hopefully, with regard to discovery and/or, you know, whether
6  or not the parties are viewing the case differently than they
7  were at the initial conference and now believe that it might
8  be productive to sit down and have a conversation about
9  whether the case can be resolved short of motion practice or
10 trial.
11          Given the nature of this case, I don't -- I'm not
12 optimistic about that, to be candid.  But I still want to
13 check in with you guys at some point towards -- you know, I
14 guess in the fall as discovery is, you know, getting -- you
15 know, more wrapped up to get a sense of, you know, where the
16 case is headed and to ensure that the case is on track.
17          So does that all make sense to you, starting with
18 you, Mr. Petrocelli?
19          MR. PETROCELLI:  Your Honor, whenever you would
20 like to have such a conference is fine by us, of course.  One
21 thought would be to wait until the conclusion of discovery,
22 perhaps even expert exchanges, and therefore set that after
23 January 16, 2023, before the filing of any dispositive
24 motions.  I think at that point everyone will have a very
25 clear view of the case.

1          But if you want to have it sooner, that's also
2  fine.
3          THE COURT:  Mr. Toberoff, what are your thoughts?
4          MR. TOBEROFF:  I think it's a very good idea to
5  have an interim conference.  I am a little -- not certain as
6  to what the purpose is.  If the purpose is to check in with
7  the parties as to the progress in the case, whether there are
8  discovery issues, things of that nature, I think we should
9  have it earlier.  If the purpose is more of the nature of a
10 trial-setting conference or dealing with things relevant to
11 trial, then I would go with Mr. Petrocelli's suggestion.
12         THE COURT:  Yeah.  You know, I'm not in the habit
13 of, you know, saying goodbye for a year to any case, Mr.
14 Petrocelli.  So although I hear you with regard to when
15 you're going to have the clearest perspective on the case I
16 do like to check in with the parties as discovery is, you
17 know, nearing the conclusion, not necessarily done, to just
18 make sure that the case is on track scheduling-wise.
19         So you know, I think that we could probably set it
20 down for another status conference or a status report if
21 you'd prefer to just, like, drop me a letter saying
22 everything is going fine, Judge. We're on track.  Or you
23 know, we're not on track and we need a conference or we need
24 more time on the discovery schedule.  Whatever the situation
25 may be, I'm open to either approach, whether it's a status

1  report or a status conference.  But it's not going to be in a
2  year.  It would be more like September.
3           So Mr. Petrocelli, what would you prefer, a status
4  report or a status conference?
5           MR. PETROCELLI:  Probably a status report only
6  because I'm starting a significant trial in front of Judge
7  Cogan in your courtroom on September 7 --
8           THE COURT:  Okay.
9           MR. PETROCELLI:  -- that will occupy me pretty much
10 full time for a while.
11          THE COURT:  Well, I certainly hope that the case
12 can get underway.  The virus is just screwing up everybody's
13 trial plans around here, but Cogan has been -- you know,
14 trepidatious, like, so I do believe Judge Cogan will do
15 everything he can to make sure that his trials go.
16          But you know, we had all these big plans to go
17 in-person for criminal duty for January and to start picking
18 more juries in January, and then look what happened, so.
19 It's awful.  It's awful.
20          MR. PETROCELLI:  Yeah.  I understand, Your Honor,
21 that -- at least for a while, perhaps even now, that you're
22 only having two trials per -- at a time in the courthouse.
23 Is that still the case?
24          THE COURT:  That has been the case.  We're picking
25 one criminal jury, basically, and one civil jury per week.

```
 1   And if the criminal trial pled out, we were trying to slot in
 2   a quick -- you know, sort of quick to prep civil trial that
 3   you could sort of slide in at short notice.
 4           But you know, we were going up that to four jury
 5   selections a week and unfortunately with omicron the
 6   determination was made that it was just not likely that, you
 7   know, trials could even get to the end because of how quickly
 8   omicron was spreading and the concerns that, you know, one
 9   juror shows up on Monday with omicron.  By the end of the
10   week everyone in the courtroom has omicron, you know.
11           So it's really no -- and I'm chuckling just because
12   it's just been so crazy, but it's obviously no laughing
13   matter.
14           So yeah, we're, you know, in this holding pattern,
15   trying to sort of take the guidance as it comes from the
16   court epidemiologist.  And there is a commitment to
17   increasing the number of jury selections but the question is
18   really one of timing at this point.  And obviously we want to
19   make sure we don't unduly jeopardize the jurors, the court
20   staff, you know, the witnesses, and you know, obviously, the
21   attorneys and the judges, as well.  But we have to think
22   about everybody who's coming into the building.
23           MR. PETROCELLI:  Of course.  Well, we sure hope
24   we're out of this by the fall of next year.
25           THE COURT:  I certainly hope so too.
```

```
 1                So in terms of your preference for a status report,
 2    that's fine with me.
 3                Mr. Toberoff, any concerns about that strategy?
 4                MR. TOBEROFF:  I would actually prefer a status
 5    conference, and if it helps the status conference we could
 6    submit a report prior to it.  I enjoy these conferences and I
 7    think they're productive.
 8                THE COURT:  Okay.  Well, how long do you think your
 9    trial's going to be, Mr. Petrocelli?
10                MR. PETROCELLI:  Oh, probably four weeks, depending
11    on how long jury selection takes.  It's a criminal case.
12    Probably four weeks would be my guess.
13                THE COURT:  Okay.  Well, given that the parties'
14    discovery schedule is on the longer side, you know, we could
15    also just push it to October.  September was sort of picked
16    at random.  It's not necessarily the month it needs to be.
17                So something like mid-October sound doable to you
18    from the perspective of your criminal trial wrapping up?
19                MR. PETROCELLI:  I think that would be fine, Your
20    Honor.
21                THE COURT:  Okay.  I'm pretty sure we're fairly
22    open at this moment in mid-October.
23                Ms. Cahn, do we have a date, you know, in or around
24    the middle of October for this case?
25                MR. PETROCELLI:  Your Honor, are we talking
```

```
 1  telephonically or in person?
 2              THE COURT:  I don't know.  Apropos of our prior
 3  conversation.
 4              At this point, everything we're scheduling is
 5  telephonic, particularly these short status conferences.  If
 6  we find ourselves with meaty issues on our hands and things
 7  are safe to do so, I would be certainly willing to convert it
 8  to an in-person, but I am finding that for the convenience of
 9  the parties if we're doing quick status check-ins, telephone
10  works for me if it works for the parties.
11              MR. TOBEROFF:  Yes.  That's fine with us.
12              THE COURT:  Okay.  Who was that?  Was that Mr.
13  Toberoff?
14              MR. TOBEROFF:  Yes.  Marc Toberoff.
15              THE COURT:  Okay.
16              Ms. Cahn, what date are you suggesting?
17              THE CLERK:  October 17th at 10:00 a.m.
18              THE COURT:  Does that work for you, Mr. Petrocelli?
19              MR. PETROCELLI:  Yes.  Thank you very much, Your
20  Honor.
21              THE COURT:  Mr. Toberoff?
22              MR. TOBEROFF:  Yes.  That works.  Thank you.
23              THE COURT:  All right.  So as of now we'll have
24  that be a telephonic status conference, same dial-in
25  information as the information used today.  If you find
```

1    yourselves with issues between now and then, you can
2    certainly let us know that by letter or letter motion
3    requesting a status conference.
4            I have very, very, very short individual rules, and
5    I recommend that you take a look at them.  If you for some
6    reason need an enlargement of any of the dates that you've
7    proposed, although they are quite long already, I'd just ask
8    for a quick letter motion to extend time.
9            If it's a discovery dispute, I have a different
10   procedure than that laid out in our Local Rule 37.3.  I
11   request that the parties file a joint letter stating their
12   respective positions.  And we try to take those matters up by
13   teleconference as quickly as possible so that we can help you
14   resolve the issue before it starts to become the litigation,
15   in lieu of the actual merits of the case.
16           So rather than wasting a lot of time on motion to
17   compel practice, I prefer to do these as quickly and
18   informally as we can.  And if we cannot resolve it, whatever
19   the dispute may be, then we can, you know, resort to the
20   normal traditional motion to compel briefing, but I find this
21   to be much more efficient.
22           So please do look at my rules if you decide that
23   you want to raise any issues between now and the status
24   conference.
25           And a couple of quick housekeeping matters.  We

```
 1   will be putting the scheduling order as modified.  You know,
 2   as indicated, I'm not going to set the pre-trial conference
 3   date at this time.  But we will put the scheduling order for
 4   the case in the minute entry, an order that we enter on ECF
 5   later today, and that is your scheduling order for the case.
 6             And as I said, if there's any need to change it,
 7   you can let me know that by letter motion.
 8             Is there anything else that the parties would like
 9   to raise or have questions about?
10             Was that Mr. Petrocelli?
11             MR. PETROCELLI:  Yeah, Your Honor.  I actually have
12   a question.
13             THE COURT:  Yes.
14             MR. PETROCELLI:  Other than discovery motions, does
15   Your Honor hear the -- like a consolidation motion or a
16   summary judgment motion, motions in limine, et cetera -- who
17   hears all of those motions?
18             THE COURT:  Well, the traditional breakdown between
19   the district judges and the magistrate judges here is that we
20   handle all non-dispositive pre-trial motions and then any
21   motions that are referred.  And Judge Gujarati certainly has
22   referred some of the substantive motions to us including, you
23   know, motions for summary judgment, motions to dismiss,
24   things along those lines.
25             But as to any given motion, some of it depends upon
```

```
 1   the respective judges' schedules and anticipated timeline of
 2   completion of the motion.  So I can't tell you at this
 3   juncture that I know for sure what my role will be with
 4   regard to pre-trial motions that are not -- that are
 5   dispositive.  You know, if there's a non-disposition motion,
 6   a motion regarding evidence, a motion regarding something,
 7   you know, that doesn't go to the merits squarely, it very
 8   likely will be before me.
 9               MR. PETROCELLI:  Okay.  Appreciate that guidance,
10   Your Honor.
11               THE COURT:  Absolutely.  Yeah.  But it is
12   somewhat -- calling it ad hoc makes it sound random.  It's
13   not random.  It just, you know, we -- the judges react to the
14   dockets as they evolve, and Judge Gujarati has a very, very
15   large docket.  And so she has definitely been referring some
16   of the substantive motions to us.  But, you know, depending
17   on what her schedule looks like, she may choose to keep a
18   motion, of course, as well.  So we're all here to just try to
19   get the cases done as expeditiously and fairly as we can.
20               MR. PETROCELLI:  Okay.
21               THE COURT:  All right.  Mr. Toberoff?  Anything
22   from you?
23               MR. TOBEROFF:  No.
24               THE COURT:  All right.
25               MR. TOBEROFF:  Thank you, Your Honor.
```

```
 1              THE COURT:  All right.  So with that, I have
 2   nothing further, as well.
 3              I believe we are adjourned.
 4              So I wish you all good afternoon.  Stay safe and
 5   have a good day.  Take care.
 6              MR. TOBEROFF:  Bye.
 7              MR. PETROCELLI:  Good afternoon.  Thank you, Your
 8   Honor.
 9              THE COURT:  Bye-bye.
10        (Proceedings adjourned at 2:30 pm)
11
12                    TRANSCRIBER'S CERTIFICATE
13              I certify that the foregoing is a correct
14   transcript from the electronic sound recording of the
15   proceedings in the above-entitled matter.
16
17                                         January 27, 2022
18   
     Terry Rubino
19
20   _____    _____
21   Terry Rubino                       DATE
22   Legal Transcriber
23
24
25
```

Opti-Script, Inc. | 800-494-7500
P.O. Box 77, Winfield, PA 17889
production@opti-script.com